IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOYCE M. RILEY, | ) |
|                Plaintiff, | ) |
| vs. | ) Civil No. 14-cv-1255-JPG-CJP |
| NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security, | ) |
|                Defendant.[1] | ) |

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. §405(g), plaintiff Joyce Riley is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).

## Procedural History

Plaintiff applied for benefits on December 10, 2010, alleging disability beginning on September 4, 2008. (Tr. 22). After holding an evidentiary hearing, Administrative Law Judge (ALJ) Kevin Martin denied the application for benefits in a decision dated February 15, 2013. (Tr. 22-38). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. See, *Casey v. Berryhill*, __ F3d. __, 2017 WL 398309 (7th Cir. Jan. 30, 2017). She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g).

1

1. The ALJ[2] erred in assessing whether plaintiff's depression was severe and failed to account for the effects of plaintiff's mental symptoms within the RFC assessment.

2. The Appeals Council erred by failing to incorporate new evidence into the record despite considering such evidence.

3. The ALJ erred in his credibility analysis.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of

---

[2] Plaintiff's brief states "The Commissioner erred" but the Court notes that the ALJ, not the Commissioner, formed the RFC assessment and assessed the severity of plaintiff's ailments.

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

>the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that

the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Martin followed the five-step framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since her alleged onset date. He found that plaintiff had severe impairments of chronic kidney disease, headaches, degenerative disc disease of the lumbar spine, osteoarthritis, and obesity. (Tr. 24).

The ALJ found plaintiff had the residual functional capacity to perform work at the light level with physical limitations. (Tr. 28). Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past work. (Tr. 21). However, she was not disabled

because she was able to perform other work that existed in significant numbers in the regional and national economies. (Tr. 22-23).

## The Evidentiary Record

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

**1. Agency Forms.**

Plaintiff was born on June 19, 1961 and was forty-seven years old at her alleged onset date. She was insured for DIB through September 30, 2008.[4] (Tr. 227). She was five feet two inches tall and weighed one hundred and ninety-four pounds. (Tr. 232). She completed high school in 1980 and was a certified nursing assistant (CNA). Plaintiff indicated she attended special education classes while enrolled in high school. She previously worked as a bakery associate, CNA, habilitation technician, and telemarketer. (Tr. 233).

Plaintiff claimed her ability to work was limited by deteriorating discs in her back, neuropathy, arthritis, headaches, kidney problems, lupus, and high blood pressure. (Tr. 232). In December 2012, plaintiff was taking Klonopin for anxiety; Lexapro for depression; Flexeril as a muscle relaxer; Lyrica for nerve damage; Norco and Percocet for pain; Seroquel for bipolar disorder; Topamax for migraines; Lisinopril as a diuretic; and potassium chloride and vitamin D as supplements. (Tr. 290).

Plaintiff completed a function report in February 2011. (Tr. 239-46). She stated that her ability to work was limited by her inability to stand for long periods of time and her inability to lift more than twenty-five pounds. (Tr. 239). On a daily basis, plaintiff watched television, got

---

[4] The date last insured is relevant to the claim for DIB, but not the claim for SSI. See, 42 U.S.C. §§ 423(c) & 1382(a).

5

dressed, and went to her daughter's house for dinner. (Tr. 240). She stated she watched a lot of television and occasionally read. (Tr. 243). She did not prepare her own meals and was unable to perform any household chores. (Tr. 241). She was able to drive and she shopped for household items once a week for about thirty minutes at a time. (Tr. 242).

Plaintiff claimed she had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, climbing stairs, remembering, completing tasks, and concentrating. She stated that she could walk one block before she would need one hour of rest. She followed written and spoken instructions well but could only pay attention for thirty minutes at a time. (Tr. 244). She did not handle stress well but could manage changes in routine. (Tr. 245). She stated that none of her medications caused side effects. (Tr. 246).

2. **Evidentiary Hearing**

Plaintiff was represented by counsel at the evidentiary hearing held on January 4, 2013. (Tr. 69). She testified that she was five feet two inches tall and weighed two hundred and twenty pounds. She stated that she had gained forty pounds since 2008. (Tr. 76). At the time of the hearing, she lived in a mobile home with her husband. Her mother-in-law and father-in-law lived on the same property but in a home. (Tr. 75). She had a driver's license but her husband drove her to the hearing. (Tr. 75-76). Plaintiff received food stamps but had not received worker's compensation or other benefits since 2008. (Tr. 77, 109). Plaintiff last worked at a Wal-Mart bakery in 2004 for six months. She left that job because it was too hard on her back. She stated that she worked as a CNA for ten years and would have to lift up to two hundred pounds on the job. (Tr. 78). She stopped working in 2004 due to medical problems. (Tr. 79).

Plaintiff testified that her degenerative disc disease, bulging discs, knee problems, and migraines physically limited her ability to work. (Tr. 79-80, 83). Her back problems made

walking difficult and caused her to sleep most of the day. She stated that on a scale of one to ten, her back pain ranged between six and ten on average. (Tr. 80). Plaintiff testified that her back pain would increase after standing for ten minutes or sitting for thirty minutes. When she took her pain pills and muscle relaxers her pain would be at a three out of ten. (Tr. 81). Plaintiff's left knee was often swollen and painful. She rated her knee pain as an eight out of ten. (Tr. 82). When she took the pain medications for her knees she rated the pain as a five out of ten. (Tr. 83).

Plaintiff stated she had migraines daily and took Topamax to make them tolerable. (Tr. 83). She also testified that she had carpal tunnel syndrome, shoulder pain when the weather was bad, kidney disease, fibromyalgia, restless leg syndrome, and lupus. (Tr. 84-86, 88, 91). She testified that she could not afford the braces for carpal tunnel syndrome and could not afford to see her kidney doctor. (Tr. 85-86, 105-06). She was supposed to get blood work drawn once every three months to monitor her kidney functioning but she could not afford the testing. (Tr. 106). Plaintiff stated that she had "a lot of depression problems," bipolar disorder, and suicidal thoughts. (Tr. 87). She saw a psychiatrist once a month. (Tr. 88). She was enrolled in a program called PCAP that assisted in paying for her medications. (Tr. 101-02). Her daughter paid for her cheaper medications. (Tr. 107).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform light work but could only occasionally climb ramps and stairs, and could never climb ladders, ropes, or scaffolding. Further, the person could only frequently balance and occasionally stoop, kneel, crouch, and crawl. (Tr. 111-12).

The VE testified that the individual could not perform any of plaintiff's previous work. However, the individual could perform jobs that exist in a significant number within the national

and regional economies. Examples of such jobs are housekeeping cleaner, nut and bolt assembler, and information clerk. (Tr. 112). The VE testified that if the individual was off task for twenty percent of the day competitive employment could not be maintained. He testified that the most a person could be off task was ten percent of the workday. (Tr. 114-16).

### 3. Medical Evidence

In November 2008, plaintiff saw Dr. James Wachter at Carterville Family Practice Center indicating she had low back pain and restless leg syndrome. (Tr. 379-80). She was not performing any daily activities. (Tr. 379). Dr. Wachter strongly recommended plaintiff increase her activity for a better range of motion. (Tr. 380). Plaintiff returned to Dr. Wachter in May 2009 complaining of back pain and headaches. He increased her migraine medications and wanted her to return in three months. (Tr. 369). Plaintiff presented at Dr. Wachter's office in September 2009 complaining of increased pain in the left temporal area and back pain. Her pain medications did not help her migraines. Plaintiff had run out of her migraine medications and Dr. Wachter restarted the medications. Plaintiff asked to be put on Lexapro for her irritable mood and anxiety. (Tr. 366). In October 2009, plaintiff reported increasing back pain and Dr. Wachter observed plaintiff's range of motion had decreased. (Tr. 364).

Plaintiff also saw kidney specialist Muhammad Kamran, M.D. in October 2009. (Tr. 318). Dr. Kamran stated plaintiff had renal insufficiency that began in August 2009. (Tr. 320). He ordered imaging of her kidney that revealed prominent soft tissue in the right kidney and the left kidney was not seen. (Tr. 326). Laboratory results indicated plaintiff had high creatinine[5]

---

[5] "Generally, a high serum creatinine level means that your kidneys aren't working well."
http://www.mayoclinic.org/tests-procedures/creatinine-test/details/results/rsc-20179431

levels and a low glomerular filtration rate (GFR) of 56.[6] In November 2009 Dr. Kamran opined that plaintiff had stage III kidney disease but that she could live a healthy life without dialysis as long as she took care of her kidney. (Tr. 314-16). A CT scan in December 2009 indicated plaintiff's left kidney was atrophied and her right kidney was compensating as a result. (Tr. 322).

From January 2010 through 2012 plaintiff saw Dr. Wachter over fifteen additional times. (Tr. 346-408, 577-632, 690-737). She frequently reported headaches, back pain, shoulder pain, and kidney issues. (*E.g.,* Tr. 349, 351, 360, 592, 577, 692). Dr. Wachter frequently changed plaintiff's medications and noted plaintiff could not afford her medications and did not have insurance. (*E.g.,* Tr. 351, 354, 360, 577, 588). The final time plaintiff saw Dr. Kamran on record was in November 2010. (Tr. 532). Dr. Kamran indicated plaintiff had stage III kidney disease, hypertension, hypokalemia, hypomagnesemia, and chronic usage of prescription medications. He indicated plaintiff needed to regularly monitor her blood levels for any indication that her kidney function was deteriorating. (Tr. 532-33).

Plaintiff also sought treatment for anxiety and depression. In February 2010 plaintiff indicated her mood was okay on Seroquel and Lexapro. (Tr. 360). In January 2011, plaintiff indicated she was sad and dysphoric with some suicidal thoughts. She was unable to obtain her medications from PCAP and Dr. Wachter provided her with samples of Lexapro and Seroquel as a result. (Tr. 349). In March 2011, Dr. Wachter noted plaintiff's mental status had improved and in his assessment he stated she had bipolar disorder. (Tr. 411, 592). In November 2011, plaintiff was referred for psychiatric treatment and indicated she had variable sleep and poor appetite. (Tr. 570). She had a depressed and irritable mood, constricted affect, and was prescribed Seroquel

---

[6] "Glomerular filtration rate (GFR) is a test used to check how well the kidneys are working. . . The GFR test measures how well your kidneys are filtering the blood. . . Levels below 60 mL/min/1.73 m$^2$ for 3 or more months are a sign of chronic kidney disease." https://medlineplus.gov/ency/article/007305.htm

XR. (Tr. 575). Later that month plaintiff reported that the Seroquel was working well. (Tr. 580).

Plaintiff presented with a nurse practitioner, Margaret Ackerman, in February 2010 with a constrained affect. (Tr. 746). She returned to Ms. Ackerman in May 2012 and Ms. Ackerman noted plaintiff's mood was affected by her pain and she had a constricted affect. She was continued on Lexapro and Seroquel. (Tr. 744). In June, Ms. Ackerman observed that plaintiff had slow speech and a constricted affect. She believed plaintiff's depression had increased due to an increase in her pain. (Tr. 742). In July 2012, plaintiff reported being shaky and anxious which may have been caused by running out of Lyrica. (Tr. 771). Plaintiff saw Ms. Ackerman twice more and was observed to have slow speech and constricted affect. Both times Ms. Ackerman continued plaintiff's medications. (Tr. 738, 740).

**4. Consultative Examinations.**

In April 2011, plaintiff had a physical consultative examination with state agency physician Dr. Adrian Feinerman. (Tr. 424-32). Dr. Feinerman felt plaintiff was reliable and noted she had a decreased range of motion in both shoulders, she would not squat, and she had mild difficulty tandem walking and standing on her toes and heels. (Tr. 424-28). Dr. Feinerman's diagnostic impressions were lumbar disc disease, fibromyalgia, and hypertension. (Tr. 428).

In April 2011, plaintiff also had a psychological consultative examination with state agency psychologist James Peterson. (Tr. 435-37). Dr. Peterson noted that plaintiff seemed drowsy but was cooperative. She made appropriate eye contact but her speech was slow. Plaintiff could recall four numbers forwards and two numbers backwards and she was oriented to time, place, and person. Plaintiff could add, subtract, and multiply single digit numbers but she did not know how to divide. (Tr. 436). Dr. Peterson's opined that plaintiff had a mood disorder due to a general medical condition as plaintiff reported long-term depression and took psychoactive

medications. (Tr. 437).

**5. RFC Assessments.**

In May 2011, plaintiff's mental RFC was assessed by state agency psychologist M.W. DiFonso, Psy.D. (Tr. 438-50). She reviewed plaintiff's records but did not examine plaintiff in person. She opined that plaintiff had a mood disorder due to a general medical condition. (Tr. 441). Dr. DiFonso indicated plaintiff had mild limitations in her activities of daily living, maintaining social functioning, and in maintaining concentration, persistence, or pace. (Tr. 448).

Plaintiff's physical RFC was evaluated by state agency physician Julio Pardo, M.D. in May 2011. (Tr. 467-73). He opined that plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds. Further, plaintiff could stand, walk, or sit for six hours out of an eight hour workday. (Tr. 467). Dr. Pardo referenced plaintiff's consultative examination with Dr. Feinerman and stated that plaintiff had no limitations in her ability to perform work related activities. (Tr. 472).

## Analysis

Plaintiff argues that the ALJ erred by finding plaintiff's depression was non-severe; failing to account for plaintiff's mental symptoms in the RFC; and in forming her credibility assessment. Plaintiff also contends that the Appeals Council erred as a matter of law in failing to incorporate new evidence into the record despite indications the council reviewed the evidence.

A claimant's RFC is "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). In other words, RFC is the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," which means eight hours a day for five days a week, or an equivalent work schedule. Social

Security Ruling 96-8P, 1996 WL 374184, at *2 (July 2, 1996) ("S.S.R. 96-8P"); *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).

In assessing a claimant's RFC, the ALJ must consider *all* of the relevant evidence in the record, and provide a "narrative discussion" that cites to specific evidence and describes how that evidence supports the assessment. The ALJ's analysis and discussion should be thorough and "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." S.S.R. 96-8, at *5, 7. The Seventh Circuit has held that "the ALJ's decision must be based on testimony and medical evidence in the record, and not on his own 'independent medical findings.'" *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Additionally, the Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

Plaintiff contends that the ALJ failed while assessing plaintiff's mental impairments in step two of the evaluation process. As previously stated, the Seventh Circuit has noted that the "second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement." *Weatherbee*, 649 F.3d 568-569. An impairment is considered "severe" if it significantly limits a claimant's ability to do basic work activities. *See* 20 C.F.R. §404.1520(a). ALJ Martin determined that plaintiff's mental impairments were not severe and that plaintiff could "perform basic mental work activities." (Tr. 25). He discussed several of plaintiff's mental health treatment records, stated that her treatment was "limited," and indicated that her medications had helped her symptoms. (Tr. 26).

Plaintiff claims the ALJ ignored evidence that indicated plaintiff's mental impairments were severe. Plaintiff refers to multiple sections of the record where she stated she was receiving counseling, received treatment from Ms. Ackerman, and had some mental difficulties during Dr. Peterson's consultative examination. (Pl. Br. 11-13). The Commissioner contends that the ALJ discussed plaintiff's treatment notes in detail and nothing suggests he ignored this evidence.

The ALJ discussed a significant amount of plaintiff's mental health record within his step two analysis. In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

While there are portions of the record the ALJ omits, he seems to have met the "lax" standard by discussing most of the evidence on file. There are portions of the record the ALJ seems to "cherry pick" but overall he minimally articulates his reasoning for finding none of plaintiff's mental impairments severe. However, the problem lies within the ALJ's RFC assessment. The ALJ is required to consider any effects of non-severe impairments on plaintiff's ability to work. SSR 96-8p states,

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do

Thus, if a non-severe impairment could impact a claimant's ability to work, the limitations must be included within the RFC assessment. Within ALJ Martin's opinion, when discussing

plaintiff's mental health history, he states, "the objective record does not support a finding of limitations in excess of those found in the residual functional capacity assessment for the period at issue." (Tr. 35). The problem with this statement is that there were *no* limitations within the residual functional capacity assessment.

While the ALJ was not required to find plaintiff's impairment severe, he was required to discuss how the non-severe impairments impacted her RFC. The Seventh Circuit addressed a somewhat similar situation in *Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008). In *Craft*, the Court held that an ALJ must consider all medically determinable impairments, even those not considered severe, when forming the RFC assessment. *Id*. at 676. Further, when the record contains evidence of mental limitations they, "must be part of the RFC assessment, because '[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work.'" *Id.* (citing 20 C.F.R. § 404.1545(a)). The Court in *Craft* opined that limiting someone to simple and unskilled work was inadequate because it did not provide information about the claimant's condition or abilities. *Id.* at 677.

Here, the ALJ failed to even limit plaintiff to simple and unskilled work. The record contains multiple instances where plaintiff had difficulty concentrating, had slowed speech, lethargy, confusion, and fatigue. (*E.g.,* Tr. 436, 691, 738, 740, 746, 757, 767). The ALJ acknowledges several of these instances within his opinion but fails to factor them into his RFC assessment in any way. (Tr. 25, 26, 29, 32, 34). These impairments in combination with the ailments the ALJ found to be severe could easily translate into work related limitations that could impact the jobs plaintiff is able to perform.

For example, the ALJ does not mention that at plaintiff's consultative examination with Dr. Peterson she was unable to divide and could only remember two numbers backwards. (Tr. 436). This is important because the VE testified that with no mental limitations one of the jobs plaintiff could perform is that of an information clerk (DOT 237.367-018). (Tr. 37). One of the primary duties of the information clerk is to "compute[] and quote[] rates" and mathematics is listed as one of the more important elements of the job. DOT 237.367-018; ONET 55305. It follows that plaintiff's difficulty remembering numbers and being unable to divide could limit her ability to do mathematics. This is just one example of how plaintiff's non-severe mental impairments could affect the RFC and the jobs plaintiff is capable of performing.

The ALJ's failure to include any limitations regarding plaintiff's mental limitations within his RFC assessment requires remand. It is therefore unnecessary to analyze plaintiff's other points in detail. The Court nevertheless makes the following observations with regard to the credibility assessment and the Appeals Council's failure to include additional medical records on the transcript.

Plaintiff argues that the ALJ erred in forming her credibility assessment. The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Id.* See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(the ALJ "must justify the credibility finding with specific reasons supported by the record."). If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski*, 245 F.3d at 887.

The ALJ found plaintiff to be less than credible for several reasons. He looked at plaintiff's activities of daily living, the objective medical evidence, the medications plaintiff took, opinion evidence, and the treatment record as a whole. While it seems as though the ALJ did a thorough job in analyzing plaintiff's credibility, this Court advises the ALJ to address the impact of plaintiff's inability to pay for more extensive treatment, testing, and medications. *See* SSR 16-3p. Reconsideration of plaintiff's credibility will require a "fresh look" on remand. *Pierce v. Colvin,* 739 F.3d 1046, 1051 (7th Cir. 2014).

Finally, the Court will address plaintiff's argument that the Appeals Council erred by failing to incorporate new evidence into the record. The Court notes that the additional evidence submitted to the Appeals Council was not included within either of the lengthy transcripts filed with this Court. This is error. Even the Commissioner concedes that these records should have been included within the transcript filed with the Court since the Appeals Council did, albeit briefly, consider this evidence. See HALLEX I-5-3-20(A)(3).

However, when looking at the Appeals Council's decision in its entirety, it is clear they purposefully focused the evidence on record prior to the ALJ's decision in forming their opinion. They merely stated that the newer evidence seems to support plaintiff's claim but that they could not consider the evidence in their decision. As a result, to give plaintiff the benefit of the doubt, the Appeals Council gave the evidence submitted after the ALJ's decision a protective filing date. (Tr. 10). This ensures that this evidence can be used in any subsequent claims pursued by plaintiff. While the omission from the transcript seems to be a harmless error, the Court advises the Commissioner that any additional records considered by the Appeals Council should be included in the transcript, should this case reach the Appeals Council again and additional records be submitted.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Riley is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

### Conclusion

The Commissioner's final decision denying Joyce Riley's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).** The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:** 3/16/2017

                                             *s/J. Phil Gilbert*
                                             **J. PHIL GILBERT**
                                             **U.S. DISTRICT JUDGE**